George L. Chingas, Jr. (8904)
K. Paul MacArthur  (8363)
MacArthur, Heder & Metler, PLLC
3319 North University Avenue
Provo, UT 84604
Telephone: (801) 377-1900
Facsimile:  (801) 377-1901
george@mhmlawoffices.com
*Attorneys for Tim Kapp; Citigen, LLC;*
*Rebound Strategies, LLC*

## IN THE UNITED STATES DISTRICT COURT,

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| REAL ESTATE SCHOOL OF NEVADA, a Nevada Corporation; REALTYSCHOOL.COM, LLC; a Nevada Limited Liability Company; LYNN E. WARDLEY, an individual;. <br><br>    Plaintiffs/Counterclaim Defendants, <br><br> vs. <br><br> TIM J. KAPP,  an individual; CITIGEN, LLC a Utah Limited Liability Company; REBOUND STRATEGIES, LLC, a Nevada Limited Liability Company; REBOUND STRATEGIES SERIES OF HENDERSON SYSTEMS, LLC, a Nevada Limited Liability Company; and ADDO RECOVERY, LLC, A Utah Limited Liability Company. <br><br> Defendants/Counter-Claimants. | **ANSWER/COUNTER-CLAIM OF DEFNEDANT TIM J. KAPP, CITIGEN, LLC, and REBOUND STRATEGIES, LLC** <br><br><br> Case No.: 2:15-CV-00043-DN <br><br> Judge David Nuffer |

|  |  |
|---|---|
| TIM J. KAPP, an individual; CITIGEN, LLC a Utah Limited Liability Company; REBOUND STRATEGIES, LLC, a Nevada Limited Liability Company,<br><br>   Counter-Claimants,<br><br>vs.<br><br>REALTYSCHOOL.COM, LLC, a Nevada Limited Liability Company; and LYNN E. WARDLEY, an individual; and REBOUND STRATEGIES SERIES OF HENDERSON SYSTEMS, LLC,  a Nevada Limited Liability Company,<br><br>   Plaintiffs/Counter-Claim Defendants/Cross-claim Defendant. |  |

Defendants, Tim J. Kapp, Citigen, LLC, Rebound Strategies, LLC (hereinafter, collectively referred to as the "Rebound Defendants") by and through their attorneys hereby answer the Complaint of the Plaintiffs, Real Estate School of Nevada, RealtySchool.com, LLC and Lynn E. Wardley as follows:

   1.  Rebound Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 1 of Plaintiffs' Complaint and on that basis, deny the same.

   2.  Admit.

   3.  Admit.

   4.  Admit.

   5.  Admit.

6.      Admit.

7.      Admit.

8.      Admit.

9.      Admit.

10.     Admit.

11.     Admit.

12.     Admit.

13.     Admit.

14.     The Rebound Members' Agreement referenced in paragraph 14 of Plaintiffs' Complaint speaks for itself.  The Rebound Defendants deny any allegations in this paragraph inconsistent with the terms of the Members' Agreement.

15.     The Rebound Defendants admit that Wardley, over time, provided an approximately additional $41,000 contribution to Rebound.  However, the timing of Wardley's contribution did not comply with the Members' Agreement to draw down HenSys's ownership interest in Rebound.  Rebound Defendants deny all other allegations in paragraph 15 of Plaintiffs' Complaint.

16.     Admit.

17.     Rebound Defendants deny that historically Rebound's business model focused on coaching individuals to help them stop smoking.  Rebound Defendants admit the other allegations in paragraph 17 of Plaintiff's Complaint.

18.     Admit.

19.     Admit.

20.     The Rebound Defendants admit that Rebound's online presence is key to the company's success. Regarding Rebound's ownership of internet domains, the Asset Purchase Agreement between Rebound and QuitSmoking.com, Inc. speaks for itself (hereinafter, the "APA").  The Rebound Defendants deny any allegations in this paragraph which contradict the terms of the APA.

21.     The APA speaks for itself (hereinafter, the "APA").  The Rebound Defendants deny any allegations in this paragraph which contradict the terms of the APA.

22.     The APA speaks for itself (hereinafter, the "APA").  The Rebound Defendants deny any allegations in this paragraph which contradict the terms of the APA.

23.     The APA speaks for itself (hereinafter, the "APA").  The Rebound Defendants deny any allegations in this paragraph which contradict the terms of the APA.

24.     The Rebound Defendants are without sufficient information to admit or deny the allegations contained in paragraph 24 of Plaintiffs' Complaint and on that basis deny the same.

25.     The Rebound Defendants admit that in approximately early 2013 Mr. Kapp and Citigen developed a software program known as a learning management system ("LMS") for Realty School.  The Rebound Defendants deny all other allegations in paragraph 25 of Plaintiffs' Complaint.

26.     The Rebound Defendants are without sufficient information to admit or deny the allegations contained in paragraph 26 of Plaintiffs' Complaint and on that basis deny the same.

27.     Admit.

28.     The Rebound Defendants affirmatively allege that Mr. Kapp and Citigen hired a team of software developers to assist him in the development of the LMS.  The Rebound Defendants deny all other allegations in paragraph 28 of Plaintiffs' Complaint.

29.     The Rebound Defendants affirmatively allege that Josh Kapp and other co-developed the source code for the LMS with Mr. Kapp.  The Rebound Defendants deny all other allegations in paragraph 29 of Plaintiffs' Complaint.

30.     The Rebound Defendants are without sufficient information to admit or deny the allegations contained in paragraph 30 of Plaintiffs' Complaint and on that basis deny the same.

31.     Deny.

32.     Rebound Defendants admit that in approximately December 2013 or January 2014, Addo was discussed among Mr. Kapp and Wardley in relation to Rebound and Realty School, they deny all other allegations in paragraph 32 of Plaintiffs' Complaint.

33.     Deny.

34.     Admit.

35.     Admit.

36.     Admit.

37.     Admit.

38.     Admit.

39.     The operating agreement for Rebound speaks for itself.  The Rebound Defendants specifically deny any allegations in paragraph 39 of Plaintiffs' Complaint which contradicts the operating agreement.

40.     Deny.

41.     Admit.

42.     The Rebound Defendants admit that Realty School and/or Rebound agreed to provide Addo with the use of the LMS in exchange for certain services and products being provided by Addo to Rebound.  The Rebound Defendants deny all other allegations in this paragraph.

43.     The Rebound Defendants admit that Realty School and/or Rebound agreed to provide Addo with the use of the LMS in exchange for certain services and products being provided by Addo to Rebound.  The Rebound Defendants deny all other allegations in this paragraph.

44.     Deny.

45.     The Rebound Defendants admit that Addo provided Rebound and Mr. Kapp access to the video content it produced.  The Rebound Defendants deny all other allegations in paragraph 45 of Plaintiffs' Complaint.

46.     Deny.

47.     Deny.

48.     The Rebound Defendants admit that Mr. Kapp assisted Addo to move to a new learning management system software.  The Rebound Defendants deny all other allegations in paragraph 48 of Plaintiffs' Complaint.

49.     Deny.

50.     The Rebound Defendants are without sufficient information to admit or deny the

allegations contained in paragraph 50 of Plaintiffs' Complaint and on that basis deny the same.

51.    Admit.

52.    Admit.

53.    The Rebound Defendants admit that Rebound fell behind on its monthly payment obligations under the APA.  The Rebound Defendants deny that Mr. Kapp was negligent or breached any duties to Rebound or the other members of Rebound which resulted in the payments falling behind.

54.    The Rebound Defendants admit that in approximately September or October, 2014, Mr. Wardley wired funds to Rebound.  The Rebound Defendants deny all other allegations in paragraph 54 of Plaintiffs' Complaint.

55.    The Rebound Defendants admit that the funds wired by Mr. Wardley in September or October, 2014 were not paid to QuitSmoking.com, Inc. under the APA.  The Rebound Defendants deny all other allegations in paragraph 55 of Plaintiffs' Complaint.

56.    Deny.

57.    The Rebound Defendants admit that the APA terminated in approximately September, 2014.  The Rebound Defendants deny all other allegations in paragraph 57 of Plaintiffs' Complaint.

58.    In response to paragraph 58 of Plaintiffs' Complaint, the Rebound Defendants incorporate their responses to the foregoing paragraphs.

59.    In response to paragraph 59 of Plaintiffs' Complaint, the Rebound Defendants assert that it contains no factual allegations but only legal conclusions for which a response is not

required.  Nonetheless, the Rebound Defendants admit that Mr. Kapp as manager of Rebound owes a duty of loyalty.  The Rebound Defendants deny all other allegations contained in paragraph 59 of Plaintiffs' Complaint.

60.     In response to paragraph 60 of Plaintiffs' Complaint, the Rebound Defendants assert that it contains no factual allegations but only legal conclusions for which a response is not required.  Nonetheless, to the extent a response is required, the Rebound Defendants admit that Mr. Kapp owes a fiduciary duty of care to Rebound and its members.

61.     In response to paragraph 61 of Plaintiffs' Complaint, the Rebound Defendants assert that it contains no factual allegations but only legal conclusions for which a response is not required.  Nonetheless, to the extent a response is required, admit that Mr. Kapp was the majority shareholder of Rebound.  The Rebound Defendants deny all other allegations in paragraph 61 of Plaintiffs' Complaint.

62.     Deny.

63.     The Rebound Defendants deny all allegations in paragraph 63 and its subparts of Plaintiffs' Complaint.

64.     Deny.

    a.  Admit.

    b.  Admit.

    c.  Admit.

    d.  Admit.

    e.  Deny.

    i.  Admit.

   ii.  Admit.

  iii.  Deny.

       1.  Admit.

       2.  The Rebound Defendants are without sufficient information to admit or deny the allegations contained in paragraph 64(e)(iii)(2) of Plaintiffs' Complaint and on that basis deny the same.

       3.  Admit.

       4.  The Rebound Defendants are without sufficient information to admit or deny the allegations contained in paragraph 64(e)(iii)(4) of Plaintiffs' Complaint and on that basis deny the same.

       5.  Admit.

       6.  Admit.

       7.  Deny.

   iv.  The Rebound Defendants admit that in approximately mid-September, 2014 that Rebound was in "dire financial straits." They also admit that Mr.Kapp made offers to buy out Mr. Wardley at this time. The Rebound Defendants deny all other allegations in this sub-paragraph.

    v.  Deny.

  f.  Deny.

65.  Deny.

66.     Deny.

67.     In response to paragraph 67 of Plaintiffs' Complaint, the Rebound Defendants incorporate their responses to the foregoing paragraphs.

68.     In response to paragraph 68 of Plaintiffs' Complaint, the Rebound Defendants assert that the operating agreement for Rebound speaks for itself.  The Rebound Defendants deny any allegations in this paragraph which contradict the terms of the operating agreement.

69.     In response to paragraph 69 of Plaintiffs' Complaint, the Rebound Defendants assert that the operating agreement for Rebound speaks for itself.  The Rebound Defendants deny any allegations in this paragraph which contradict the terms of the operating agreement.

70.     In response to paragraph 70 of Plaintiffs' Complaint, the Rebound Defendants assert that the operating agreement for Rebound speaks for itself.  The Rebound Defendants deny any allegations in this paragraph which contradict the terms of the operating agreement.

71.     Deny.

72.     Deny.

73.     In response to paragraph 73 of Plaintiffs' Complaint, the Rebound Defendants assert that the operating agreement for Rebound speaks for itself.  The Rebound Defendants deny any allegations in this paragraph which contradict the terms of the operating agreement.

74.     Deny.

75.     Deny.

76.     In response to paragraph 76 of Plaintiffs' Complaint, the Rebound Defendants incorporate their responses to the foregoing paragraphs.

77.     In response to paragraph 77 of Plaintiffs' Complaint, the Rebound Defendants assert that it contains no factual allegations but only legal conclusions for which a response is not required.  Nonetheless, to the extent a response is required, the Rebound Defendants admit that Mr. Kapp owed a fiduciary duty of care and loyalty to Rebound and its members.

78.  Deny.

79.  Deny.

   a.  Admit.

   b.  Admit.

   c.  The Rebound Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 79(c) of Plaintiffs' Complaint and on that basis deny the same.

   d.  Admit.

   e.  The Rebound Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 79(e) of Plaintiffs' Complaint and on that basis deny the same.

   f.  Admit.

   g.  Admit.

   h.  Deny.

80.     Deny.

81.     Deny.

82.     Deny.

83.     In response to paragraph 83 of Plaintiffs' Complaint, the Rebound Defendants incorporate their responses to the foregoing paragraphs.

84.     Admit.

85.     Admit.

86.     Deny.

87.     The Rebound Defendants assert that the Member Agreement for Rebound speaks for itself.  They deny any allegations in paragraph 87 which contradict the terms of the Member Agreement.

88.     The Rebound Defendants admit that Mr. Wardley subsequently agreed to become the investor referenced in the Member Agreement.  Rebound Defendants assert that he failed complied with the terms of the Member Agreement to obtain the additional interest in Rebound.

89.     The Rebound Defendants admit that Mr. Wardley agreed to contribute the $50,000 and his agreement was accepted by the other members of Rebound.

90.     The Rebound Defendants admit that on or about December, 2013 Wardley contributed $10,000 to Rebound.  The Rebound Defendants deny all other allegations in paragraph 90 of Plaintiffs' Complaint.

91.     Admit.

92.     Deny.

93.     Deny.

94.     In response to paragraph 94 of Plaintiffs' Complaint, the Rebound Defendants incorporate their responses to the foregoing paragraphs.

95.     Admit.

96.     Rebound Defendants admit that Realty School paid some compensation to Citigen for services Citigen provided to Realty School.  They deny all other allegations in paragraph 96 of Plaintiffs' Complaint.

97.     Admit.

98.     Deny.

99.     Deny.

100.    Deny.

101.    In response to paragraph 101 of Plaintiffs' Complaint, the Rebound Defendants incorporate their responses to the foregoing paragraphs.

102.    Admit.

103.    Whether or not the LMS enjoys copyright protection pursuant to 17 USC §101 and 17 USC §102(a)(1) is a legal conclusion which requires no response.  The Rebound Defendants deny all other allegations in paragraph 103 of Plaintiffs' Complaint.

104.    Deny.

105.    The Rebound Defendants admit that Josh Kapp and Bowlegged Design are distinct from Citigen and Mr. Kapp.  They deny all other allegations in paragraph 105 of Plaintiffs' Complaint.

106.    Admit.

107.    Admit.

108.    Deny.

109.   In response to paragraph 109 of Plaintiffs' Complaint, the Rebound Defendants incorporate their responses to the foregoing paragraphs.

110.   The allegations in paragraph 110 of Plaintiffs' Complaint are legal conclusions which require no response.  The Rebound Defendants deny all other allegations in paragraph 110 of Plaintiffs' Complaint.

111.   Deny.

112.   Deny.

113.   Deny.

114.   Deny.

115.   Deny.

116.   Deny.

117.   In response to paragraph 117 of Plaintiffs' Complaint, the Rebound Defendants incorporate their responses to the foregoing paragraphs.

118.   The Rebound Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 118 of Plaintiffs' Complaint, and on that basis, deny the same.

119.   Admit.

120.   Deny.

121.   Admit.

122.   Deny.

123.   Deny.

124. Deny.

125. Deny.

126. Deny.

127. Deny.

128. In response to paragraph 128 of Plaintiffs' Complaint, the Rebound Defendants incorporate their responses to the foregoing paragraphs.

129. Deny.

130. Deny.

131. Deny.

132. Deny.

133. Deny.

134. Deny.

135. In response to paragraph 135 of Plaintiffs' Complaint, the Rebound Defendants incorporate their responses to the foregoing paragraphs.

136. Deny.

137. The operating agreement for Rebound speaks for itself. The Rebound Defendants deny all allegations in paragraph 137 of Plaintiffs' Complaint which contradict the terms of the operating agreement.

138. Deny.

The Rebound Defendants deny any allegation in Plaintiffs' Complaint for which they have not specifically responded above.

**AFFIRMATIVE DEFENSES**

1.      Plaintiffs' Complaint should be dismissed because it fails to state a cause of action against the Rebound Defendants upon which relief can be granted.

2.      Plaintiffs have a duty to mitigate their damages.  Should discovery evidence a failure by Plaintiffs to mitigate their damages, if any, the Rebound Defendants reserve the right to assert failure to mitigate damages as a separate affirmative defense.

3.      Plaintiffs damages, if any, were proximately caused by Plaintiffs' own fault or other actionable conduct.

4.      Plaintiffs Complaint is barred by the doctrines of acquiescence, waiver, and/or estoppel.

5.      Plaintiffs' claims for equitable relief are barred by the doctrine of unclean hands.

6.      Plaintiffs' claims are barred, in whole or in part, to the extent the Plaintiffs have received the benefit of the bargain and did not detrimentally rely on defendants and have not sustained any legal injury.

7.      Plaintiffs lack standing to bring or maintain one or more of the claims asserted in their Complaint.

8.      Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' knowledge of and assumption of the risk involved in the relevant transaction.

9.      Any and all damages or losses allegedly sustained by Plaintiffs, if any, are the result, in whole or in part, of superseding or intervening causes over which the Rebound Defendants had not control.

10.     Plaintiffs' Claims are barred, in whole or in part, by their fraud in the inducement.

11.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of mandatory election of remedies.

12.     Plaintiffs claim are barred by their own prior breaches of the various agreements referenced in Plaintiffs' Complaint.

13.     Plaintiffs' claims regarding Wardley's contribution agreement with Rebound is barred by the statute of frauds.

14.     The Rebound Defendants hereby adopt and incorporate by reference all affirmative defenses raised by any other defendant in this case.

WHEREFORE, the Rebound Defendants request that the Court enter judgment as follows on Plaintiffs' Complaint:

1.      That Plaintiffs' Complaint be dismissed in its entirety, with prejudice;

2.      That the Rebound Defendants be awarded their attorneys' fees and costs in accordance with the operating agreement of Rebound or under any other statutory or contractual basis;

3.      For such other relief as the Court deems just and reasonable under the circumstances.

## COUNTER-CLAIM/CROSS-CLAIM

Tim J. Kapp, Citigen, LLC and Rebound Strategies, LLC, by and through their attorneys, assert the following counter-claims against Lynn E. Wardley and RealtySchool.com  and a cross claim against HenSys and allege as follows:

## PARTIES AND JURISDICTION

1.      Tim J. Kapp is an individual residing in Utah County, State of Utah.  His is a member of Rebound and manager of the company.  He is also the majority member of Citigen, LLC.

2.      Rebound Strategies, LLC is a Nevada limited liability company with its principal place of business located in Las Vegas, Nevada.

3.      Citigen, LLC is a Utah limited liability company with its principal place of business located in Provo, Utah.

4.      Rebound Strategies Series of Henderson Systems, LLC is a Nevada limited liability company with its principal place of business located in Nevada.

5.      Lynn E. Wardley is an individual residing in Nevada who is a member of Rebound and RealtySchool.com and a shareholder in Real Estate School of Nevada, Inc.

6.      RealtySchool.com is a Nevada limited liability company with its principal place of business located in Henderson, Nevada.

7.      The United Stated States District Court of Utah has jurisdiction in this matter pursuant to 28 USC §§1331 and 1367.

8.      This Court is the proper venue for this case as well.

## FACTUAL ALLEGATIONS

### A. Rebound

9.      In approximately the middle of 2011, Mr. Kapp approached Wardley as a potential investor in Rebound which was a small start-up company which provided services and

products to help people overcome smoking addictions.

10.     On or about October 5, 2011, Rebound was formed as a manager managed company, with Mr. Kapp assigned as the manager of the company.

11.     According to Rebound's operating agreement, ownership of Rebound was originally vested in three owners: 1) Citigen, LLC as a 55% owner; 2) Rebound Strategies of Henderson Systems, LLC ("HenSys") as a 35% owner; and Wardley as a 10% owners.

12.     Wardley made a capital contribution to Rebound of $50,000 for his ownership interest in Rebound.

13.     Citigen and HenSys' capital contribution to Rebound for their ownership interest was to consist of intangible contributions by Tim Kapp and HenSys' owner, Jason Henderson such as expertise in certain areas and managing the company.

14.     In November, 2011, Rebound entered into an asset purchase agreement with QuitSmoking.com, Inc. ("QuitSmoking") which is owned by Fred Kelley ("APA").

15.     Under the APA, Rebound acquired the right to use QuitSmoking's internet domain names, trademarks, etc. and the right to operate the various internet domains associated with overcoming smoking addiction.

16.     In exchange, Rebound was to pay QuitSmoking a total of $1,000,000 over a specified period of time.

17.     The payments from Rebound to QuitSmoking were monthly and varied based on the income of Rebound.  There was a required minimum monthly payment and also a cap on a maximum monthly payment based on certain financial indicators of Rebound.

18.     Under the APA, the transfer of the assets would not fully vest in Rebound until the entire purchase price was paid.  Further, Rebound's performance under the APA was secured by the assets being transferred.

19.     In approximately December, 2013, Rebound's largest vendor, Lee Pharmaceuticals, suddenly and unexpectedly charged Rebound's credit card nearly $10,000 for a product order where payment should not have been due for some time.

20.     Lee Pharmaceuticals would not refund the payment which caused a significant cash shortfall for Rebound.  This crisis caused a series of actions by Mr. Kapp to try and resolve Rebound's financial problem and maintain the company's viability.

21.     In December, 2013, Wardley contributed $10,000 to Rebound to help with this immediate cash flow problem.

22.     In approximately December, 2013, Mr. Kapp communicated the financial problems of Rebound as well as its future potential to the other members of Rebound with some suggested solutions.

23.     Mr. Kapp suggested a merger with Addo Recovery, LLC ("Addo").  Addo is an addiction treatment company with specialization in betrayal trauma, pornography addiction, sexual addiction, and related issues.

24.     Through online membership and various treatment programs, Addo provides access to an online library of videos, audio programs, and assessments for use by its members.

25.     Mr. Kapp felt that the various areas of expertise of both Rebound and Addo complemented each other which made the merger an attractive option for both companies.

26.     Furthermore, Mr. Kapp suggested an agreement among the members of Rebound to obtain further financing from an investor to assist with Rebound's immediate cash flow problems.

27.     On or about February 28, 2014, the members of Rebound signed a Member Agreement which would dilute the ownership interest of HenSys in favor of the new investor who was to contribute at least $50,000 to Rebound by July 31, 2014.

28.     The additional investment was necessary for the continued operation of Rebound.

29.     According to the Member Agreement, if Rebound was able to obtain $50,000 from the as yet, unnamed investor before July 31, 2014, HenSys would agree to dilute its ownership from 35% to 10%.

30.     Subsequently, Wardley agreed to be the investor to contribute $50,000 to Rebound in exchange for receiving an additional 25% interest in Rebound.

31.     In approximately March and April, 2014, a contribution agreement was negotiated between Wardley and Kapp for Wardley's investment of $50,000 to Rebound in accordance with the Member Agreement.

32.     Despite the terms of the agreement being agreed upon by Wardley and his attorney, Wardley refused to sign the contribution agreement.

33.     Meanwhile, in March, Wardley contributed another $5,000 to Rebound.

34.     In April, Wardley contributed another $15,000 to Rebound despite the fact that he had not executed the contribution agreement.  His total contribution in accordance with the Member Agreement to that point was $30,000.

35.     By approximately July 25, 2014, Wardley informed Kapp that he was not going to invest any further funds into Rebound even though he had not invested the full $50,000 by that time.

36.     In light of Wardley's refusal to honor his agreement to contribute the additional $50,000 funds to Rebound, Kapp started to seek other avenues to obtain additional funds for Rebound.

37.     During August and September 2014, Kapp presented several options to Wardley which would have brought in a new investor for Rebound and re-pay Wardley the $30,000 he had already contributed plus interest.

38.     For approximately three weeks in October, 2014, Wardley would not communicate with Kapp to accept or reject the various proposals.  Meanwhile, Rebound was in default on several of its various financial obligations including the APA with QuitSmoking.com.

39.     Eventually, in September, 2014, Wardley informed Kapp that he wanted Kapp to make a buyout proposal to him for his interest in Rebound.

40.     Kapp presented several buyout proposals, but Wardley never responded to the proposals.

41.     By approximately October, 2014, Rebound was completely insolvent with the inability to pay its financial obligations or deliver product to its customers.

42.     As a result of its inability to pay its main distributor of its products, the distributor seized all of Rebound's inventory.  Therefore, it had no ability to provide product to its customers who had already paid their fees.

43.    In October, Wardley contacted Kapp and told him he was going to contribute another $8,000 to Rebound to bring its obligation with QuitSmoking.com current under the APA.

44.    Kapp responded that at that point, any funds available to Rebound would first have to be used to reimburse customers of Rebound who had paid for product, but had not received it.  He informed Wardley to not contribute the $8,000 at that time because it would not be sufficient to resolve Rebound's financial insolvency.

45.    Nonetheless, without Kapp's knowledge, Wardley wired $8,000 into Rebound's account.  As Kapp indicated to Wardley, he had to use these funds to reimburse customers of Rebound and the funds were used for that purpose.

**B.    RealtySchool.com**

46.    From May 2013 – May 2014, Kapp on behalf of Citigen created and continually updated the learning management software ("LMS") for RealtySchool.

47.    RealtySchool paid Citigen for creating the LMS, but at a discounted rate as Kapp and Wardley were partners in Rebound.

48.    Citigen hired other software and content developers to help him with the creation of the LMS including his brother Josh Kapp of Bowlegged Turtle Designs, Steven Ri, an independent developer located in China, Justin Britton, a graphic designer, and Meg Walters, a video content director.

49.    Until May, 2014, these developers were paid by Citigen for their efforts on the LMS.

50.    Subsequent  and parallel to the creation of the LMS Kapp on behalf of Citigen

and at the request of Wardley, produced or performed the following for RealtySchool or

Wardley:

      a.   All training videos for RealtySchool customers which were loaded onto the LMS.

      b.   All Adobe Captivate presentations and student assessments

      c.   A website and phone lead system for Wardley Property Management (one of

          Wardley's other businesses)

      d.   Online advertising for Wardley Property Management for a period of

          approximately six months.

      e.   Scripted and managed the creation of videos for Wardley Property Management

      f.   A website for 3DayHomeSale.com which was another side business for Wardley

          and Kapp also created videos for the website.

      g.   High end call routing and notification system for leas for Wardley property

          management.

      h.   IT support for Real Estate School of Nevada; helping with email, google apps,

          logins, etc.

      i.   Provided technical analysis and opinions for several companies Wardley was

          considering investing in. Finicity, MyRooms, ABC HealthCard (which Josh also

          spent time reviewing at Wardley's request.)

      j.   A website for RealtySchool.com and high end call routing system and setup of the

          two separate customer relationship management systems, integration of call

          routing with two different CRM systems.

     k.   Kapp hired and helped manage RealtySchool's sales people answering calls and reconciled monthly sales reports etc.

     l.   Online advertising for RealtySchool.com.

     m.   Significant additional features for the LMS which were requested after the original software had been created which was beyond the scope of the original software design.

51.    In approximately Jan, 2014 Kapp approached Wardley and explained that what Citigen was now doing for RealtySchool and Wardley's other entities far exceeded the scope of originally just creating the LMS.

52.    Wardley agreed and both Wardley and Kapp agreed that in addition to the compensation paid to Citigen, Citigen would be given a 10% ownership interest in RealtySchool.com. When Kapp requested to have documents executed confirming this agreement, Wardley continually delayed at first stating that RealtySchool.com had not been officially created and later because he supposedly wanted to execute all the agreements simultaneously with Addo and the contribution agreement withRebound.

**C.    Addo Recovery, LLC.**

53.    Beginning in approximately December, 2013, Rebound and Addo were working toward a partnership arrangement which they hoped would eventually result in a merger between Addo and Rebound.

54.    Wardley was made aware of this plan and agreed that Rebound should pursue the opportunity with Addo.

55. In approximately January, 2014, Rebound, Realty Schooland Addo reached an agreement as follows:

    a. Citigen would provide to Addo the following:

        i. A new website for Addo;

        ii. An assessment system for the LMS; and

        iii. A lead management system

    b. RealtySchool would provide to Addo:

        i. Access to the LMS plus additional features would need to be added to address Addo's specific needs;

    c. Wardley would provide to Addo:

        i. Access to a faith based distribution channels with whom he had direction association in order to generate leads for Addo.

    d. In exchange, Addo would provide to Rebound the following:

        i. A video based addiction course for smokers;

        ii. Ongoing Youtube videos and articles to improve Rebound's search marketing.

    e. Also, Addo agreed to be a charter customer for RealtySchool's LMS and spend time and resources vetting the product, reporting problems to RealtySchool and assisting LMS create a marketable LMS system.

56. This agreement was beneficial for all parties additionally because it involved the exchange of products and services without the payment of any compensation from either side.

57.    By approximately June, 2014, Addo had completed the video based addiction course and these were provided to Mr. Kapp and Rebound.  The video course was also sent to Wardley for his review.

58.    Also by mid to late June, 2014 RealtySchool provided access to the LMS for Addo which it began testing.  The LMS provided to Addo by RealtySchool was in beta form because it did not include the additional features needed by Addo to operate its business and it had never been launched with any external customers

59.    It was known by the parties from the beginning that the LMS from RealtySchool would need to be modified and have additional features to accommodate Addo's online business. Among other issues, Addo offered subscriptions to its customers whereas RealtySchool offered access to online courses in real estate.

60.    In July and August, 2014 Addo communicated directly with RealtySchool regarding its use of the LMS, features that were still required before public launch, and some "bugs" that needed to be fixed in the system.

61.    In August, 2014, for the first time, RealtySchool insisted that in addition to the foregoing exchange of services and products, that Addo pay a monthly license fee to RealtySchool and an hourly fee for any further "fixes" to the LMS including changes that it was known from the beginning, would need to be made to bring the LMS to final production for Addo.

62.    RealtySchool refused to make the changes to the LMS needed to bring it to production for Addo without charging the additional amounts listed above.  It also insisted that

Addo either agree to the licensing and other fees or stop using the LMS.

63.     As a result, of RealtySchool's breach of the agreement, Addo stopped using the LMS which was of no commercial value to them in any event, and terminated the arrangement with Rebound and RealtySchool.

64.     Wardley and RealtySchool's actions also destroyed any chance that Rebound and Addo would eventually merge.

**D.     QuitSmoking.com**

65.     By approximately September, 2014, Rebound was in default under the APA with QuitSmoking.com because of its inability to make the monthly payments.  This was largely a result of Wardley's failure to honor his promise to contribute the $50,000 to Rebound by July 31, 2014.

66.     QuitSmoking.com was threatening foreclosure under the APA which would have allowed it exercise full control and ownership over the domain sites being used by Rebound under the APA.

67.     Foreclosure by QuitSmoking.com would have also allowed QuitSmoking.com to immediately seize all of the domains and Rebound would have been left without any assets from the APA with QuitSmoking.com.

68.     In an effort to retain some value for Rebound and its members, in November, 2014, Rebound entered into a Clarification Agreement with QuitSmoking.com whereby Rebound was allowed to retain domains roughly equal in value to the amount Rebound had paid under the APA to that point which was approximately $53,000.

69.   Kapp had an independent appraisal done of the domains attached to the APA by an independent appraiser.  Based on that appraisal, Kapp chose the domains which he believed to be the most valuable which roughly had a combined value of $53,000.

70.   Under the Clarification Agreement, Rebound retained these three internet domains and QuitSmoking.com retained all of the other domains and assets under the APA.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Breach of Contract**
**(Rebound v. Wardley)**

71.   Rebound incorporates by reference the foregoing allegations as if fully stated herein.

72.   In approximately March, 2014, Wardley agreed to contribute an additional $50,000 to Rebound by July 31, 2014 in exchange for receiving an additional 25% ownership in the company.

73.   Wardley knew that it was critical to the survival of Rebound that it receive the additional $50,000 investment prior to July 31, 2015.

74.   Wardley partially performed under the contribution agreement by providing $5,000 to Rebound in March, 2014 and another $15,000 in April, 2014.  In addition to an earlier payment of $10,000 to Rebound which was credited to Wardley under the contribution agreement, Wardley had only paid $30,000 by July 31, 2014.

75.   Wardley's failure to pay the $50,000 to Rebound by July 31, 2014 constitutes a material breach of the contribution agreement.

76.     As a result of Wardley's breach of the contribution agreement, Rebound suffered

damages, including consequential damages in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
### Fraud
### (Rebound v. Wardley)

77.     Rebound incorporates by reference the foregoing allegations as if fully stated

herein.

78.     In approximately March, 2014, Wardley represented to Rebound that he would

invest an additional $50,000 by July 31, 2014 to Rebound in accordance with the Rebound

Member Agreement which was signed by Kapp, Wardley and HenSys.

79.     Wardley knew at the time he made this representation that the investment was

necessary for the financial survival of Rebound.

80.     Wardley's representation in this regard was false and Wardley knew it was false

because he never intended to contribute the $50,000 to Rebound by July 31, 2015.

81.     Terms for Wardley's contribution to Rebound were agreed to by Rebound and

Wardley by approximately April, 2014.

82.     Nonetheless, Wardley refused to sign the contribution agreement drafted by

Rebound.

83.     Additionally, in March, 2014 and April 2014 Wardley made partial contributions

to Rebound further inducing Rebound to believe that Wardley would perform under the

contribution agreement.

84.     Rebound reasonably relied upon Wardley's false representation that he would

contribute the $50,000 to Rebound by July 31, 2014 partially because Wardley would periodically pay portions of the $50,000 when he was informed that Rebound was about to default on important obligations.

85.     Rebound relied upon Wardley's false representation to its detriment because, but for the false representation it could have obtained additional funding and investment from other investor(s) which would have allowed the company to survive its financial crises.

86.     As a result of Wardley's misrepresentation, Rebound was damaged in an amount to be determined at trial which should include punitive damages.

### THIRD CLAIM FOR RELIEF
### Promissory Estoppel
### (Rebound v. Wardley)

87.     Rebound incorporates by reference the foregoing allegations as if fully stated herein.

88.     In March, 2014, Wardley promised Rebound that he would contribute $50,000 to Rebound by July 31, 2014 in exchange for an additional 25% ownership interest in Rebound.

89.     Rebound acted with prudence and reasonable reliance on this promise made by Wardley because he had contributed to Rebound in the past, was a member of Rebound and he made partial contributions in furtherance of his promise in March and April, 2014.

90.     Wardley knew that Rebound relied upon his promise to contribute the additional $50,000 to Rebound and which he should have reasonable expected to induce Rebound's forebearance in seeking other opportunities for investors which could have met its immediate financial needs.

91.     Wardley was aware of all material facts surrounding his promise to contribute to Rebound because he was a party to Rebound's member agreement for additional funding and he knew of Rebound's financial problems at the time.

92.     Rebound relied upon Wardley's promise to invest an additional $50,000 in Rebound which resulted in significant damages to Rebound including its inability to meet its financial obligations and remain solvent and it losing out on an opportunity to merge with Addo.

93.     Therefore, Rebound seeks a judgment against Wardley in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**Breach of Contract**
**(Citigen v. RealtySchool.com)**

94.     Rebound incorporates by reference the foregoing allegations as if fully stated herein.

95.     From May 2013 – May 2014, Kapp on behalf of Citigen created and continually updated the learning management software ("LMS") for RealtySchool.

96.     RealtySchool paid Citigen for creating the LMS, but at a discounted rate as Kapp and Wardley were partners in Rebound.

97.     Citigen hired other software and content developers to help him with the creation of the LMS including his brother Josh Kapp of Bowlegged Turtle Designs, Steven Ri, an independent developer located in China, Justin Britton, a graphic designer, and Meg Walters, a video content director.

98.     Until May, 2014, these developers were paid by Citigen for their efforts on the

LMS.

99.     Subsequent  and parallel to the creation of the LMS Kapp on behalf of Citigen and at the request of Wardley, produced or performed the following for RealtySchool or Wardley:

a.  All training videos for RealtySchool customers which were loaded onto the LMS.

b.  All Adobe Captivate presentations and student assessments

c.  A website and phone lead system for Wardley Property Management (one of Wardley's other businesses)

d.  Online advertising for Wardley Property Management for a period of approximately six months.

e.  Scripted and managed the creation of videos for Wardley Property Management

f.  A website for 3DayHomeSale.com which was another side business for Wardley and Kapp also created videos for the website.

g.  High end call routing and notification system for leas for Wardley property management.

h.  IT support for Real Estate School of Nevada; helping with email, google apps, logins, etc.

i.  Provided technical analysis and opinions for several companies Wardley was considering investing in. Finicity, MyRooms, ABC HealthCard (which Josh also spent time reviewing at Wardley's request.)

j.  A website for RealtySchool.com and high end call routing system and setup of the

two separate customer relationship management systems, integration of call
routing with two different CRM systems.

k.  Kapp hired and helped manage RealtySchool's sales people answering calls and
reconciled monthly sales reports etc.

l.  Online advertising for RealtySchool.com.

m.  Significant additional features for the LMS which were requested after the
original software had been created which was beyond the scope of the original
software design.

100.    In approximately Jan, 2014 Kapp approached Wardley and explained that what
Citigen was now doing for RealtySchool and Wardley's other entities far exceeded the scope of
originally just creating the LMS.

101.    Wardley agreed and both Wardley and Kapp agreed that in addition to the
compensation paid to Citigen, Citigen would be given a 10% ownership interest in
RealtySchool.com.

102.    When Kapp requested to have documents executed confirming this agreement,
Wardley continually delayed at first stating that RealtySchool.com had not been officially
created and later because he supposedly wanted to execute all the agreements simultaneously
with Addo and the contribution agreement with Rebound.

103.    In approximately May, 2014, Wardley shut Citigen out of RealtySchool's system
thereby preventing him from further providing the ongoing service and product to RealtySchool
as outlined above.

104.     Until that point, Citigen had fully performed under the terms of their agreement which should have resulted in Citigen owning a 10% interest in RealtySchool.com.

105.     RealtySchool.com has breached the agreement by failing to give Citigen a 10% interest in RealtySchool.com.

106.     As a result Citigen has been damaged in an amount equal to a 10% ownership interest in RealtySchool.com.

107.     Citigen is entitled to an order from the court that RealtySchool.com give to Citigen a 10% interest in the company in accordance with the parties' agreement.

**FIFTH CLAIM FOR RELIEF**
**Promissory Estoppel**
**(Citigen v. RealtySchool.com)**

108.     Rebound incorporates by reference the foregoing allegations as if fully stated herein.

109.     In approximately January, 2014, RealtySchool.com promised Citigen that in exchange for the products and services provided by Citigen to RealtySchool.com and other of Wardley's companies as outlined in paragraph 50 above, RealtySchool.com would give Citigen a 10% ownership interest in RealtySchoo.com.

110.     Citigen acted with prudence and reasonable reliance on the promise of RealtySchool.com and continued creating the products and performing the services outlined in paragraph 50 above until approximately May, 2014.

111.     RealtySchool.com  knew that Citigen relied upon this promise and would act upon it by continuing to provide the services and products to RealtySchool.com and Wardley's

other businesses based on the promise.

112.    RealtySchool.com was aware of all material facts surrounding its promise to give Citigen an ownership interest in the company when it made the promise.

113.    Citigen relied upon RealtySchool.com's promise which resulted in significant damages to Citigen including the lost time, resources, compensation and other opportunities it could have pursued.  Additionally, RealtySchool.com has now refused to provide Citigen a 10% interest in the company.

114.    Accordingly, the court should enter a judgment in favor of Citigen against RealtySchool.com in the form of a 10% interest in the company or other monetary damages to be proved at trial.

**SIXTH CAUSE OF ACTION**
**Fraud**
**(Citigen v. RealtySchool.com and Wardley)**

115.    Rebound incorporates by reference the foregoing allegations as if fully stated herein.

116.    In approximately, January, 2014, Wardley, on behalf of RealtySchool.com represented to Citigen that it would give to Citigen a 10% ownership interest in RealtySchool.com if Citigen continued to provide products and services as outlined in paragraph 50 above to RealtySchool.com, Wardley and Wardley's other companies.

117.    This representation was false when Wardley made it and he knew it was false because neither he nor RealtySchool.com intended to provide Citigen a 10% interest in RealtySchool.com.

36

118.    Wardley and RealtySchool.com knew or should have known that Citigen would rely upon the false representation to its detriment.

119.    Citigen reasonably relied upon the false representation to its detriment because it continued to provide the services and products until at least May, 2014 without receiving the promised interest in RealtySchool.com.

120.    Citigen has been damaged by Wardley and RealtySchool.com's misrepresentation in an amount at least equal to a 10% interest in RealtySchool.com.

121.    Citigen is entitled to a judgement against Wardley and RealtySchool.com including a 10% ownership interest in RealtySchool.com, plus punitive damages and attorney fees.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment
### (Citigen v. Wardley and RealtySchool.com)

122.    Rebound incorporates by reference the foregoing allegations as if fully stated herein.

123.    By providing the services and products to Wardley and RealtySchool.com as outlined in paragraph 50 above, Citigen conferred a significant benefit upon RealtySchool.com and Wardley.

124.    Wardley and RealtySchool.com had knowledge of this benefit and accepted it when it used the services and products provided by Citigen.

125.    Citigen expected Wardley and RealtySchool.com to compensate it in the form of a 10% interest in RealtySchool.com, Wadley and RealtySchool.com refused to provide Citigen

this expected in return for its services and products.

126.    By failing to provide Citigen a 10% ownership interest in RealtySchool.com as promised, Wardley and RealtySchool.com has been unjustly enriched through retaining the benefit of the services and products without paying fair market value for them.

127.    Under the circumstances, it would be unjust to allow Wardley and RealtySchool.com to retain the benefit of these services and products without paying fair market value for them.

128.    As a result, Citigen is entitled to compensation from Wardley and Citigen in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### Dissolution of Rebound
### (Kapp v. Wardley and HenSys)

129.    Rebound incorporates by reference the foregoing allegations as if fully stated herein.

130.    As evidenced by Wardley's Complaint in this matter and the instant counterclaim, it is evident that there exists an irreparable deadlock between the members of Rebound regarding the management of and financial status of Rebound.

131.    As a result, Kapp hereby petitions the court for an order of dissolution of Rebound, for its assets to be sold and distributed in accordance with Rebound's operating agreement.

## PRAYER FOR RELIEF

WHEREFORE, Tim J. Kapp, Rebound Strategies, LLC and Citigen, LLC request that the court enter judgment against the counter-claimants as follows:

1)      For an award of actual, consequential and incidental damages in an amount to be determined at trial;

2)      For punitive damages against RealtySchool.com and Wardley in an amount calculated to punish them for their wrongful conduct and to deter them from similar conduct in the future;

3)      For an award of attorneys' fees as allowed under the various agreements identified herein and/or as allowed by law;

4)      For pre-and post judgement interest;

5)      For an order dissolving Rebound and distributing its assets in accordance with the company's operating agreement;

6)      For such other relief as the court deems just and proper in the circumstances.

DATED and SIGNED this 18th day of March, 2015.

MACARTHUR, HEDER & METLER

/s/ George L. Chingas, Jr.

_____

*Attorneys for Tim J. Kapp*; *Citigen, LLC;*
*and Rebound Strategies, LLC*

**MAILING CERTIFICATE**

I hereby certify that a true and correct copy of the foregoing Defendant's Answer and

Counter-claim was served via electronic notification, to the following this 18th day of March,

2015:

>   Matthew L. Lalli
>   Adam C. Buck
>   SNELL & WILMER
>   15 West South Temple, Suite 1200
>   Gateway Tower West
>   Salt Lake City, UT 84101

>   /s/ George L. Chingas, Jr.
>   _____
>   *Attorneys for Tim Kapp; Citigen, LLC;*
>   *Rebound Strategies, LLC*